AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| The Blue Samsung Cell Phone with IMEI | )   Case No. **1:21-MJ-00212** |
| 359301100553303 That is Currently in Law | ) |
| Enforcement Custody at 550 Main St. Suite 8-491, | ) |
| Cincinnati, OH 45202 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Attached Affidavit (incorporated by reference).

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Remick-Cook, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime Video Conference_____ *(specify reliable electronic means).*

Date: ____**Mar 12, 2021**____

*Stephanie K. Bowman*
*Judge's signature*

City and state: ____Cincinnati, Ohio____

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## <u>ATTACHMENT A</u>

The property to be searched is a blue Samsung cell phone with IMEI 359301100553303 that is currently in law enforcement custody at the Cincinnati Field Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives at 550 Main St. Suite 8-491 Cincinnati, OH 45202. The Device is pictured below:







      This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery), 371 (Conspiracy) and 922(g)(1) (Felon in Possession of a Firearm or Ammunition) (the Target Offenses) involving LAMOND JOHNSON and other unknown coconspirators after on or about February 8, 2021, specifically:

    a.    All records and information relating to firearms and ammunition, including information about sources of firearms and ammunition (including names, phone numbers, addresses, and other identifying information);

    b.    All records and information relating to the location of the Device, of LAMOND JOHNSON, and of any coconspirators relating to the Target Offenses;

    c.    All records and information relating to communications to and from the user of the Device and any coconspirators relating to robberies that occurred in the Southern District of Ohio on or about February 8 and 9, 2021;

    d.    All records and information relating to communications to and from the user of the Device relating to a shooting at Madeira Beverage on or about February 9, 2021;

    e.    All records and information relating to vehicles used in furtherance of the Target Offenses;

    f.    All records and information relating to U.S. currency;

    g.    All records and information relating the possession and/or disposition of stolen property relating to the Target Offenses;

h. All records and information relating to the identity and whereabouts of any coconspirators involved in the commission of the Target Offenses;

i. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
THE BLUE SAMSUNG CELL PHONE
WITH IMEI 359301100553303 THAT IS
CURRENTLY IN LAW ENFORCEMENT           Case No. **1:21-MJ-00212**
CUSTODY AT 550 MAIN ST. SUITE 8-491,
CINCINNATI, OHIO 45202

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, John Remick-Cook, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a search warrant authorizing the examination of property—an
electronic device—that is currently in law enforcement possession, and the extraction from that
property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and
Explosives (ATF) and have been so employed since March of 2015. As a part of my training
with the ATF, I graduated from the Federal Law Enforcement Training Center, Criminal
Investigator School, located in Glynco, Georgia. I also graduated from the ATF Special Agent
Basic Training Academy, located in Glynco, Georgia, in February of 2016. In my career with
ATF I have been assigned to and worked with the Cleveland Police Department's Gang Impact
Unit and am currently assigned to an Organized Crime Task Force, which investigates criminal
organizations in the Southern District of Ohio. Prior to my employment with ATF, I was a

member of the Metropolitan Police Department in Washington, D.C., where I served as a member of the Third District Crime Suppression Team, Narcotics and Special Investigations Division's Gun Recovery Unit and as an Investigator with the Criminal Investigations Division. I was employed in that capacity from December of 2008 to March of 2015. I have received additional training in several areas of law enforcement, including but not limited to gang investigations, narcotics interdiction and investigation, and firearms interdiction and investigation. Many of my investigations have involved the seizure of cell phones and other electronic devices, as well as the analysis of their contents for evidence relating to the crimes under investigation. I am also a graduate of the University of New Hampshire, where I received two bachelor's degrees in Sociology and Justice Studies in 2008.

3.     The information in this affidavit is based on my own investigation as well as information relayed to me by other agents and officers and my review of records. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is the blue Samsung cellular phone with IMEI 359301100553303 (the "Device").  The Device is currently in law enforcement custody at the ATF Cincinnati Field Office at 550 Main St. Suite 8-491, Cincinnati, OH 45202.

5.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

2

**PROBABLE CAUSE**

### A. Introduction

6.      Over the course of two days, from February 8 to 9, 2021, five gas stations or convenience stores in Hamilton, Mason, Madeira, Blue Ash, and Lebanon, Ohio (all within the Southern District of Ohio), were robbed. In one of the robberies, the suspect shot the owner of the store, who later died from his injuries.

7.      As I explain in more detail below, based on the investigation to date, I believe that the same suspect is responsible for each of the robberies and that he had at least one coconspirator who drove the get-away car and may have entered at least one of the stores.

8.      I am now seeking this warrant for a cell phone that, based on the investigation to date, I believe was used by one of the perpetrators at the time of at least some of the robberies.

### B. On February 8, 2021, at around 7:48 pm, a Shell gas station in Mason was robbed by a suspect carrying a firearm.

9.      On February 8, 2021, at approximately 7:48 pm, the Warren County Sheriff's Office received a report of a robbery at the Shell Gas Station at 9791 Mason Montgomery Road in Mason, OH. Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

10.      Surveillance video from that evening, which includes audio, shows that two Shell Gas Station employees, Victim 1 and Victim 2, were working behind the counter in the area of the cash registers when a suspect who appears to be a Black male entered the gas station. The suspect was wearing a black hooded sweatshirt that read "Nike" in white lettering, with a white Nike "swoosh" logo. The sweatshirt's hood was over his head. The suspect was also wearing black pants with a white logo on the left pant leg, black gloves, black shoes with a small bit of

3

white on the top, and a red face mask or bandana with white accents, as shown in the screenshot below.



11.     After entering, the unidentified suspect walked around the counter to the employee area, where Victim 1 and Victim 2 were standing. The unidentified suspect then demanded that Victim 1 and Victim 2 open the cash register and place the currency from the cash registers in a bag. Victim 1 and Victim 2 each opened their respective cash registers and placed the currency from their cash registers into separate plastic bags. The unidentified suspect then took the bags and left. As the suspect left, Victim 1 and Victim 2 raised their hands in a gesture that, based on my training and experience, I believe they intended to mean "Do not shoot."

12.     Surveillance video shows that, after leaving the gas station, the unidentified suspect ran west.

13.     Surveillance video from a nearby BP gas station, which is located south of the Shell station, shows that, at approximately the same time as the robbery, a person ran from the

4

Shell station over to Monro Auto Service, which is west of the Shell station, and got into a large, white SUV as a passenger. The SUV drove away. Based on this video, I believe that the suspect had a coconspirator who was driving the getaway vehicle.

14.    In an interview, Victim 1 and Victim 2 both said they had seen a firearm.

15.    The screenshot below shows a map of 9791 Mason Montgomery Road, Monro Auto Service, the BP station, and surrounding areas:



**C. Less than an hour later, a Shell gas station in Hamilton was robbed by an armed suspect matching the same description.**

16.    Less than an hour later, at approximately 8:34 pm on February 8, the Hamilton Police Department received a report of a robbery at the Shell Gas Station at 2693 Dixie Highway in Hamilton, OH.  This Shell gas station is approximately 17 miles from the Shell station described in the preceding section; a search for directions on Google Maps shows that driving from one to the other would take approximately 28 to 35 minutes, depending on the route.

17.     Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

18.     Surveillance video from that evening shows a suspect matching the description of the suspect in the earlier robbery entering the gas station. Specifically, the surveillance video shows an individual who appears to be a Black male and who appears to be wearing the same outfit as the suspect from the Mason incident: a black hooded sweatshirt reading "Nike" and with the "swoosh" logo (and with the hood up), black gloves, black shoes with a tiny bit of white on top, and a red face mask or bandana with white accents pulled across his face. The suspect appears to be holding a firearm in his right hand, as shown below:



19.     Surveillance video shows that the unidentified suspect walked behind the counter, while holding the suspected firearm in his right hand, to where a Shell Gas Station employee (Victim 3) was standing. The unidentified suspect then directed Victim 3 to put the currency

from the cash register into a bag. Victim 3 complied, and the unidentified suspect then took the bag and left.

20.     The screenshot below shows a map of the relevant Shell gas station in Hamilton and surrounding areas:



**D. The next day, at approximately 7:39 pm, Victim 4 was shot and killed during an attempted robbery at Madeira Beverage.**

21.     The next day, on February 9, 2021, at approximately 7:39 pm, Madeira Police Department received a report of an attempted robbery in which a person had been shot. The attempted robbery occurred at Madeira Beverage, a convenience store, located at 6005 Kenwood Road, Madeira, OH. Madeira Beverage is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

22. The shooting victim (Victim 4) was the owner of Madeira Beverage and had been working in Madeira Beverage that evening. Victim 4 succumbed to his gunshot-related injuries later that same night.

23. That same night, MPD Officers and participating officers located an expended .25 caliber cartridge casing suspected to be ejected from the firearm during the shooting of Victim 4.

24. Surveillance video from that evening shows that an unidentified suspect, who appears to be a Black male, entered the store wearing a black hooded sweatshirt. The sweatshirt had an unidentifiable white logo or text in the upper left chest area. The suspect was also wearing a red face mask or bandana on his face.



25. The unidentified suspect entered the store and appeared to look down multiple aisles as he walked through the store. The unidentified suspect then confronted Victim 4, at which time Victim 4 and the unidentified suspect appeared to push and wrestle with each other

for approximately four seconds. Victim 4 then raised his hands as the unidentified suspect displayed and pointed a firearm at Victim 4, as shown in the image below:



26.     Surveillance footage shows that Victim 4 then appeared to wave the unidentified suspect away.  Victim 4 then stepped backwards and turned while holding his abdomen. The unidentified suspect then exited Madeira Beverage.

27.     External surveillance cameras show the unidentified suspect running from the building in a southern direction.

28.     The screenshot below is a map of 6005 Kenwood Road, where Madeira Beverage is located, and surrounding areas.



**E.  Less than 15 minutes later, a Sunoco gas station in Blue Ash was robbed at gunpoint.**

29.     Less than 15 minutes later, at approximately 7:50 pm on February 9, Blue Ash

Police Department received a report of a robbery at the Sunoco Gas Station at 10410 Kenwood

Road in Blue Ash, OH. This Sonoco is approximately five miles from Madeira Beverage, both of

which are on Kenwood Road.

30.     Sunoco Gas Station is engaged in the sale of alcohol and/or other items that,

based on my training and experience, I know have affected interstate commerce.

10



31. Surveillance video of this incident is not currently available for review.

32. I have reviewed a statement written out by a law enforcement officer who interviewed an employee working at the Sonoco gas station that night (Victim 5). The statement indicates that the police officer "wrote out [the] statement" for Victim 5 "due to language barrier." Victim 5 said that the suspect was a Black man wearing a red jacket and a black face mask. Victim 5 said that he/she "saw a small black gun." Victim 5 said that the suspect aimed the firearm at Victim 5 and said "open the register & take a plastic bag & put in the money." Victim 5 said that he/she and the suspect then put money in the bag and that the suspect then took the bag and ran out towards Kenwood, around the building.

33. Although Victim 5's description of the unidentified suspect differs from the description of the suspect observed in surveillance video described above, I believe that the same

11

suspect, and/or his coconspirator, was likely involved in this robbery due to the geographic and temporal proximity to the other robberies described in this affidavit.

34.     As I described above, surveillance video relating to the incident at the Shell station in Mason suggests that, after the robbery, the suspect got into a white SUV as the passenger. Similarly, as I describe below, a witness to the fifth robbery, in Lebanon, saw the suspect run from the store and get into a vehicle as a passenger. Based on these facts, I believe that the robber was not acting alone.

**F.  About 90 minutes later, a suspect in a black hoodie and a red mask attempted to rob a Marathon gas station in Lebanon at gunpoint.**

35.     Later the same night, at approximately 9:19 pm, Lebanon Police Department (LPD) received a report of an attempted robbery at the Marathon Gas Station located at 660 North Broadway Street, Lebanon, OH. This Marathon is approximately 18 miles away from the Sonoco described in the preceding section; a search on Google Maps suggests that a direct trip between the two would take approximately 25 minutes.

36.     Marathon Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

37.     Based on reports I have reviewed, I understand that the surveillance cameras in the Marathon gas station were not operational at the time of the incident.

38.     An employee of the Marathon Gas Station, Victim 6, said that a Black male entered the store wearing a black sweatshirt and with a red mask on his face with white accents on the fabric.

39.     Victim 6 said the unidentified suspect entered the store, removed a soda pop from the cooler, and approached the counter. Victim 6 stated he/she told the suspect how much the

soda pop cost, at which the time suspect pointed a firearm at Victim 6 and staid, "Give me what you got." Victim 6 said he/she did not comply with the suspect's demand and instead leaned down and grabbed under the counter, pretending he/she had a firearm. Victim 6 said the unidentified subject then ran from the Marathon Gas Station.

40.    Victim 6 said he/she saw what he/she believed to be a black or dark-blue Chevy Equinox, with its headlights off, pick up the unidentified subject and travel south on North Broadway. Victim 6 described the driver as a Black male wearing a mask of an unknown color.

41.    Victim 6 said he/she attempted to follow the vehicle as it drove south on North Broadway. In addition, traffic cameras in the city of Lebanon captured a suspected Chevrolet Equinox driving with its headlights off as it continued south on North Broadway and then turned left on Main Street, driving east.

42.    The screenshot below is a map of the location of the Marathon gas station and surrounding areas:



**G. Based on the investigation to date, I believe that the same two suspects likely committed all five of the robberies described above.**

43.     Because of the geographic and temporal proximity of all five of the robberies; because surveillance video shows a similar suspect in a black hooded sweatshirt and with a red face covering in the first, second, third, and fifth robbery; and because surveillance video or Victim statements from some of the robberies suggest that the unidentified suspect entered a getaway vehicle as a passenger, I believe that the same unidentified suspect and a coconspirator are involved in all of the robberies described above.

**H. Information from Google suggests that Google accounts associated with LAMOND JOHNSON were present at at least four of the robberies.**

44.     Based on my training and experience, as well as open-source materials published by Google LLC ("Google"), I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

45.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device.  Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data.  Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

46.     On February 12, 2021, the Honorable Judge Karen Litkovitz, U.S. Magistrate Judge for the Southern District of Ohio, issued Search Warrant No. 1:21-MJ-0158, requiring Google to provide information and records relating to any Google accounts that were present at particular locations and particular times associated with the robberies described above, specifically:

<u>Incident 1: Shell Gas Station - 9791 Mason-Montgomery Road, Mason, OH</u>

- Date: February 8, 2021
- Time Period: 7:40pm – 7:55pm EST (Eastern Standard Time), UTC -5 Hours
- Target Location:  Area contained within below listed points
  - Point A: 39.296221, -84.317776
  - Point B: 39.296090, -84.315510
  - Point C: 39.295320, -84.315633
  - Point D: 39.295428, -84.317975



<u>Incident 2: Shell Gas Station - 2693 Dixie Highway, Hamilton, OH</u>

- Date: February 8, 2021
- Time Period:  8:25pm – 8:40pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  - Point A: 39.369753, -84.548786
  - Point B: 39.369605, -84.547314
  - Point C: 39.368719, -84.546825

      o      Point D: 39.368824, -84.548856



Incident 3: Madeira Beverage - 6005 Kenwood Road, Madeira, OH

- Date: February 9, 2021
- Time Period: 7:30pm – 7:45pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location: Geographical area contained within the below listed points
  - Point A: 39.175858, -84.384784
  - Point B: 39.176247, -84.383480
  - Point C: 39.175407, -84.383912
  - Point D: 39.175346, -84.385028



Incident 4: Sunoco Gas Station – 10410 Kenwood Road, Blue Ash, OH

16

- Date: February 9, 2021
- Time Period: 7:45pm – 8:00pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location: Geographical area contained within the below listed points
  - o Point A: 39.251869, -84.375335
  - o Point B: 39.250308, -84.372321
  - o Point C: 39.249677, -84.372466
  - o Point D: 39.249163, -84.375551



## Incident 5: Marathon Gas Station – 660 North Broadway Street, Lebanon, OH

- Date: February 9, 2021
- Time Period: 9:10pm – 9:25pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location: Geographical area contained within the below listed points
  - o Point A: 39.445865, -84.206635
  - o Point B: 39.445717, -84.203383
  - o Point C: 39.442454, -84.204506
  - o Point D: 39.442628, -84.207484

17



47.     On March 1, 2021, Google provided Anonymized Device Identification (ID) information for Google accounts present at the described locations and time ranges. I conducted an analysis of the Anonymized Device ID information and identified three Anonymized Device IDs—ID numbers -967784745, 469003545, 290681031—that, according to Google's data, were present at all of the following locations during the time periods listed above:

- February 8, 2021 – Shell Gas 9791 Mason-Montgomery Rd., Mason, OH

- February 8, 2021 – Shell Gas 2693 Dixie Hwy, Hamilton, OH

- February 9, 2021 – Sunoco Gas 10410 Kenwood Rd., Blue Ash, OH

- February 9, 2021 – Marathon Gas 660 N. Broadway St., Lebanon, OH

48.     I requested that Google provide identifying information for those three IDs, and on March 5, 2021, Google provided information showing that the Anonymized Device IDs are associated with the following Google Account IDs:

- Anonymized Device ID -96778475  = Google Account ID 369781974448

- Anonymized Device ID 469003548 = Google Account ID 583241281066

- Anonymized Device ID 290681031 = Google Account ID 849998195587

18

49.     The records from Google showed that Google Account ID 369781974448 is associated with the following subscriber:

    a.  Name: LAMOND JOHNSON

    b.  Email: johnsonlamond33@gmail.com

    c.  Recovery Email: johnsonlamond3@gmail.com

    d.  Recovery SMS: 513-280-1364

50.     Google Account ID 583241281066 is associated with the following subscriber:

    a.  Name: Salvatore Ferragamo

    b.  Email: johnsonlamond3@gmail.com

    c.  Recovery Email: johnsonlamond33@gmail.com

    d.  Recovery SMS: 513-280-1364

51.     Google Account ID 849998195587 is associated with the following subscriber:

    a.  Name: LAMOND JOHNSON

    b.  Email: johnsonlamond86@gmail.com

    c.  Recovery Email: None Listed

52.     Because all three of these accounts are associated with the name "LAMOND JOHNSON" either in the subscriber name or in the email address (all three of which are variations on "johnsonlamond"), I believe that all three of these accounts are used by the same person. Moreover, because 513-280-1364 is the "Recovery SMS" phone number for two of the three accounts, I believe the user of these accounts likely uses 513-280-1364. Based on my training and experience, I know that a "Recovery SMS" phone number is the phone number to which Google sends a text message if the user forgets the password to his or her account.

19

53.     On March 5, 2021, I queried telephone number 513-280-1364 through a database accessible by law enforcement that I have determined in the past to be accurate and credible. Based on this query, I identified telephone number 513-280-1364 to be associated with LAMOND JOHNSON (which is consistent with the subscriber names and email addresses described above).

### I.   LAMOND JOHNSON is a convicted felon.

54.     In 2006, LAMOND JOHNSON was convicted of Kidnapping, Rape, and Aggravated Robbery in Lucas County, Ohio. He was sentenced to 14 years' imprisonment for those offenses and is currently on parole.

### J.   On March 7, 2021, LAMOND JOHNSON attempted to flee after law enforcement pulled over the Equinox he was driving; a firearm and the Device were found in the vehicle.

55.     On March 7, 2021, agents and officers began surveilling a dark-blue Chevrolet Equinox (the "Equinox") being driven by LAMOND JOHNSON. Agents and officers were able to maintain surveillance by following GPS location data for phone number 513-280-1364, which, as described above, had been linked to JOHNSON and to four of the robberies via information from Google.

56.     On March 7, 2021, at approximately 3:21 pm, GPS location information showed that the device with phone number 513-280-1364 (linked to JOHNSON) was in the approximate area of Beekman Street and Pulte Street, near the English Woods neighborhood of Cincinnati, OH. At approximately the same time, the surveillance unit lost sight of the Equinox in the area of the English Woods neighborhood.

57.     At approximately 3:36 pm that afternoon, GPS location information for 513-280-1364 (linked to JOHNSON) showed that the phone was in the approximate area of Ezzard

20

Charles Drive and Baymiller Walk, near the West End neighborhood of Cincinnati. At approximately the same time, an emergency call was made to Cincinnati Police Department (CPD) in relation to an individual with a firearm in the approximate area of 800 Findlay Street, Cincinnati (approximately .51 miles from where the GPS location for 513-280-1364 put the device at 3:36 pm). Security cameras captured images of the individual and vehicle; when I reviewed those images, I saw that they matched the description of JOHNSON and the Equinox.

58.     Later that day, when agents and officers attempted to stop the Equinox, two men—LAMOND JOHNSON and an unidentified individual—ran from the vehicle. JOHNSON was arrested, but the unidentified individual escaped. Another passenger remained in the vehicle.

**K.  The Device was found inside the Equinox JOHNSON had been driving, and he later acknowledged that it was his.**

59.     After the other passenger was removed from the Equinox, agents saw a cell phone (the Device) in the vehicle's center console. Agents removed the Device and placed it in a bag designed to prevent its contents from being modified pending the securing of search warrant.

60.     Later the same day, on March 7, 2021, agents obtained a federal search warrant authorizing the search of the Equinox, including any electronic devices inside it.

61.     During the search of the Equinox pursuant to the search warrant, investigators located a firearm under the driver's seat of the vehicle. This firearm was identified as a Phoenix Model HP25A, .25 caliber pistol with serial number 4419156. The firearm serial number was queried, and it was determined to have been reported stolen in Dayton Ohio in 2018.

62.     In a Mirandized interview on March 7, 2021, JOHNSON said, in sum and substance (and among other things), that his cell phone number is 513-280-1364 and that he has had that phone number for a long time. JOHNSON also said that his cell phone was in still in the

vehicle and that it is a was a blue Samsung (note that this description is consistent with that of the Device, which is a blue Samsung phone).

63.     Based on the above information, I submit that there is probable cause to believe that JOHNSON has committed violations of 18 U.S.C. §§ 922(g)(1) (Felon in Possession of a Firearm or Ammunition), 1951(a) (Hobbs Act Robbery) and 371 (Conspiracy) and that evidence of those crimes will be located on the Device.

64.     The Device is currently in the lawful possession of the ATF under the circumstances described above. Therefore, while the ATF might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

65.     The Device is currently in storage at the ATF's Cincinnati Field Office at 550 Main St. Suite 8-491, Cincinnati, OH 45202. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the ATF.

## **TECHNICAL TERMS**

66.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other

23

digital data.  Some portable media players can use removable storage media.
Removable storage media include various types of flash memory cards or
miniature hard drives.  This removable storage media can also store any digital
data.  Depending on the model, a portable media player may have the ability to
store very large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite
contains an extremely accurate clock.  Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special
sequence of numbers.  These signals are sent by radio, using specifications that
are publicly available.  A GPS antenna on Earth can receive those signals.  When
a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs.  Some PDAs also function as wireless communication
devices and are used to access the Internet and send and receive e-mail.  PDAs

24

usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

67.   Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

25

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

68.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

69.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few

26

examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

70.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

71.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

72.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

73.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.


Respectfully submitted,

_____

JOHN REMICK-COOK
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me
On March  12 , 2021. **via electronic means, specifically Facetime video.**

_____
HON. STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

The property to be searched is a blue Samsung cell phone with IMEI 359301100553303 that is currently in law enforcement custody at the Cincinnati Field Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives at 550 Main St. Suite 8-491 Cincinnati, OH 45202. The Device is pictured below:







This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.　　All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery), 371 (Conspiracy) and 922(g)(1) (Felon in Possession of a Firearm or Ammunition) (the Target Offenses) involving LAMOND JOHNSON and other unknown coconspirators after on or about February 8, 2021, specifically:

  a.　All records and information relating to firearms and ammunition, including information about sources of firearms and ammunition (including names, phone numbers, addresses, and other identifying information);

  b.　All records and information relating to the location of the Device, of LAMOND JOHNSON, and of any coconspirators relating to the Target Offenses;

  c.　All records and information relating to communications to and from the user of the Device and any coconspirators relating to robberies that occurred in the Southern District of Ohio on or about February 8 and 9, 2021;

  d.　All records and information relating to communications to and from the user of the Device relating to a shooting at Madeira Beverage on or about February 9, 2021;

  e.　All records and information relating to vehicles used in furtherance of the Target Offenses;

  f.　All records and information relating to U.S. currency;

  g.　All records and information relating the possession and/or disposition of stolen property relating to the Target Offenses;

h.   All records and information relating to the identity and whereabouts of any coconspirators involved in the commission of the Target Offenses;

i.   Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.